UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| QUENTIN L. TAYLOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:22-cv-02169-SEB-KMB |
| | ) | |
| DENNIS REAGLE, | ) | |
| CENTURION HEALTH, | ) | |
| AKILAH LAMAR, | ) | |
| ARYANNA MOSS, | ) | |
| JERMY LAREAU, | ) | |
| WILLIAM Sgt., | ) | |
| CAMPBELL Ofc., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Quentin L. Taylor ("Mr. Taylor"), a Pendleton Correctional Facility ("Pendleton") inmate proceeding *pro se*, brought this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that Defendants were deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment to the United States Constitution. Defendants Centurion Health of Indiana, LLC ("Centurion"), Akilah Lamar, PsyD, Aryana Moss, MHP, and Jeremy LaReau, MSW/LSW (collectively, "Centurion Defendants") as well as Dennis Reagle, Sergeant Jacob Williams, and Officer Chris Campbell (collectively, "Pendleton Defendants") have moved for summary judgment. Dkt. 72, 80. For the reasons below, those motions are **GRANTED**.

## STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## FACTUAL BACKGROUND

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar*, 985 F.3d at 572–73.

## I.    The Parties

Mr. Taylor is an Indiana Department of Correction ("IDOC") inmate currently incarcerated at Pendleton. At all times relevant to this litigation, Mr. Taylor has been housed in G-Cellhouse ("G-House"), a restricted housing unit.

Centurion is a contractor that provides medical care services for IDOC. In this litigation, Mr. Taylor names the following Centurion Defendants, each of whom has administered mental health treatment to him: Akilah Lamar, PsyD ("Dr. Lamar"), a psychologist; Aryana Moss, MHP ("Ms. Moss"), a mental health professional; and Jeremy LaReau, MSW/LSW ("Mr. LaReau"), a mental health professional.

At all relevant times, Dennis Reagle ("Warden Reagle") was the warden at Pendleton, and Sergeant Jacob Williams ("Sgt. Williams") and Officer Chris Campbell ("Officer Campbell") worked as correctional officers.

## II.    Access to Mental Health Services

In G-House, as with all other restrictive-status housing ("RSH"), inmates may request medical or mental health services at any time by verbally making such requests to mental health and/or correctional staff members or by submitting health care request slips, which are made available upon request. Reagle Aff. ¶ 6(a), dkt. 81-2. There are no limitations on the number of health care request slips that any inmate may submit nor the amount

3

of mental health services they may receive, subject to the mental health providers' professional judgment to render or deny services. *Id.* ¶ 6(b).

Inmates placed in RSH units meet with mental health providers either by way of officer-escorted, in-cell appointments or unescorted, one-on-one counseling sessions. For the latter category, the inmate remains "locked in a wire fence style enclosure," which allows for "full face-to-face contact," for the duration of each session. *Id.* ¶ 6(c).

Unlike general population housing units, RSH units permit inmates greater access to mental health services because mental health providers conduct daily check-ins, thereby generating routine opportunities for inmates to receive or otherwise request mental health services. *Id.* ¶ 6(d). RSH inmates are not, however, permitted to participate in group therapy. *Id.*

Sgt. Williams and Officer Campbell, as correctional officers, are not personally authorized to administer inmate health care services, nor can they override the clinical decision-making of health care staff members. Williams Aff. ¶ 14, dkt. 81-3. Accordingly, correctional officers defer to health care staff members on all aspects of inmates' medical treatment. *Id.*

## III.    Mr. Taylor's Mental Health Treatment

Mr. Taylor has been diagnosed with depression and anxiety. As early as October 2019, Mr. Taylor's "mental status classification" was "Code D," which means that he had been diagnosed with a "[p]sychiatric disorder that causes some impairment and requires frequent psychiatric and/or psychological services and/or the individual has a history of a serious suicide attempt while in a correctional setting." Dkt. 77-1 at 3. As "a D code," Mr.

Taylor was monitored by mental health providers on a daily, weekly, and monthly basis. *See id.*; dkt. 72-1 at 23, 30.

Below, we recite the relevant treatment that Mr. Taylor received during the ten month period from January 3, 2022, through November 23, 2022.

### A.    January 2022

On January 3, 2022, Mr. Taylor was taken to the nursing unit for treatment after complaining of chest pains (evidently related to his history of asthma). Lamar Aff. ¶ 9, dkt. 72-1. A medical exam revealed that Mr. Taylor had been suffering "mild generalized inspiration wheezes." Dkt. 72-1 at 15. Mr. Taylor also reported that he needed fresh air because the cell where he was housed felt "suffocating," and his inhaler was not providing any relief. *Id.* He did, however, indicate that he felt "better" after the walk from cell housing to the nursing unit. *Id.* According to Mr. Taylor's medical records from this visit, he was "reassured and returned back to his cell house[ ]" without further incident. *Id.*

On January 6, 2022, Ms. Moss visited Mr. Taylor in G-House for an "RHU review," during which Ms. Moss noted that Mr. Taylor was argumentative and noncooperative in his responses to her questions. Mr. Taylor disclosed that he was experiencing suicidal ideations on occasion but was not feeling suicidal at the time of this encounter. Mr. Taylor's principal complaint was that he was being "treated unfairly by custody staff." *Id.* at 20.

On January 13, 2022, Mr. Taylor was visited by Mr. LaReau for a four-week post-suicide watch follow-up,[1] during which Mr. Taylor complained that the "water in his cell

---

[1] The parties have not revealed any further details about any prior suicide attempt.

doesn't work, [that he] wants to be assessed by a psychiatrist for medications, [that he] hasn't showered in two weeks due to fear" of the correctional officers, and "that he is always feeling stressed out." *Id.* at 23. Mr. Taylor did not report any suicidal ideations at the time, but he did request puzzles and other reading materials to keep him occupied.

### B.    February 2022

On February 11, 2022, Mr. Taylor was seen by a non-party psychiatrist, William Mays ("Dr. Mays"), who noted that Mr. Taylor's psychiatric history included major depressive disorder recurrent, post-traumatic stress disorder ("PTSD"), and substance use disorder. Mr. Taylor described his recent mood as irritable and depressed and shared that he had gotten into fights with other inmates/staff in recent months. Dr. Mays increased Mr. Taylor's Remeron dose, which he had been prescribed to treat his depression. Later that same day, Mr. Taylor met with Mr. LaReau, who listened to Mr. Taylor's concerns about his incarceration and engaged Mr. Taylor in solutions-based therapy by encouraging Mr. Taylor to evaluate how his own behaviors contributed to his negative encounters with jail staff.

### C.    March 2022

On March 9, 2022, Mr. Taylor was notified that a mental health care provider had arrived for a therapy session; however, Mr. Taylor declined to participate, stating, "no, I'm good." Dkt. 72-1 at 33.

In a health care request form dated by Mr. Taylor on March 31, 2022, Mr. Taylor asked to speak with a mental health provider for an out-of-cell appointment. Dkt. 77-1 at 11. Medical staff's (only) documented response indicated that Mr. Taylor "will be scheduled for follow up"; no further details are revealed by the record before us. *Id.*

6

### D.    April 2022

On April 10, 2022, Mr. Taylor met with non-party Registered Nurse ("RN") Precious Onomuodeke to whom he disclosed that he was feeling suicidal because he did not feel safe in his housing arrangement. Mr. Taylor was thus placed on temporary mental health hold.

The next day, on April 11, 2022, Ms. Moss visited Mr. Taylor, who recounted his struggles with the cell-housing environment. Ms. Moss noted that Mr. Taylor was not receptive to her suggested coping mechanisms and denied having had suicidal ideations. Mr. Taylor was therefore released from the mental health hold.

On April 18, 2022, Mr. LaReau met with Mr. Taylor to conduct an RHS review. Mr. Taylor reported that he had recently been written up for a fight and aired various grievances, including that he should not be in RSH based on his "Serious Mental Illness." He stated that he had developed blisters on his feet from pacing around his cell; that he had received recreation time only three times since January 2022 (rather than three times a week, as Mr. Taylor believed he was entitled); and that he had had recent trouble sleeping. Dkt. 72-1 at 45–47. Mr. Taylor also reported that he had not showered in forty-four days due to fear of the correctional officers. According to Mr. LaReau's notes, Mr. Taylor was unreceptive to suggested coping strategies, but they did discuss sleep techniques. Mr. Taylor did not report any suicidal feelings, though Mr. LaReau reminded him to submit health care request forms if and as necessary.

On April 28, 2022, non-party Psychiatric-Focused Nurse Practitioner Lindsay Manning ("Ms. Manning") met with Mr. Taylor to discuss his medication management.

Although Mr. Taylor had been taking his Remeron medication routinely, he reported experiencing symptoms of anxiety, sleep disturbances, depressed and irritable mood, and feelings of being overwhelmed. Ms. Manning thus increased Mr. Taylor's Remeron dosage.

### E.    May 2022

On May 7, 2022, Mr. Taylor submitted a health care request form, as follows:

> Can I please speak to somebody from mental health. I'm having crazy thought[s] and having thoughts about hurting myself! Can I speak to somebody out of cell so I can maybe clear my head. I don't feel right[.] My mind is going crazy!!

Dkt. 77-1 at 15.

The next day, on May 8, 2022, Mr. Taylor again submitted a health care request form, as follows:

> I would really like to speak to someone. I don't feel right, my thoughts are crazy and I don't feel right!! I'm having crazy feelings and thoughts and I need to speak to somebody. I can't sleep, my mind is going too fast, and I'm having crazy thoughts and feeling suicidal. Can I please get out of this cell I'm going crazy! I need to speak to somebody!

*Id.* at 16.

On May 10, 2022, Mr. Taylor again submitted the following health care request form:

> I really would like to speak to mental health staff[.] I keep asking the officers to call somebody from mental health. I'm having serious issues and I need help. I'm having thoughts that are not right and it's overwhelming. Can you pull me out for an out of cell meeting. I feel like hurting myself and the noise and the voices are real. I can hear them and I know nobody will believe me or care. I just want them to know so why did they come?

*Id.* at 17.

That same day, on May 10, 2022, Mr. Taylor was scheduled with a non-party medical medical provider for an annual health examination. (It is unclear, however, whether this appointment related to Mr. Taylor's previous requests for mental health care services.) Mr. Taylor "refused" the medical visit and "signed a refusal" form. Dkt. 72-1 at 54.

On May 11, 2022, Mr. Taylor wrote a "do not resuscitate" note, stating that, in the event he is "found dead or unconscious," he did not want IDOC or medical providers to attempt to resuscitate him. Dkt. 77-1 at 18. Mr. Taylor did not share this note with either Sgt. Williams or Officer Campbell, giving it directly to Mr. LaReau instead during an out-of-cell therapy session later that same day. While talking to Mr. LaReau, Mr. Taylor reported being "hot in cell – no fans allowed" and feeling hopeless. Dkt. 72-1 at 56. The session ended abruptly, however, when Mr. Taylor pulled a bag of pills out of his sock stating that he "want[ed] to die" and consuming an assortment of unidentified pills that he had obtained from other inmates. *Id.*; Taylor Dep. 18:25–19:3, dkt. 81-1. (Mr. LaReau estimated that Mr. Taylor ingested twenty to thirty pills; Mr. Taylor estimates that he swallowed forty-six. *Id.*; Taylor Decl. ¶ 10, dkt. 78-1.) Mr. LaReau promptly reported the incident to Sgt. Williams and Officer Campbell, who were on RHS duty at the time, and made record of Mr. Taylor's suicide attempt, noting that Mr. Taylor would thereafter remain on suicide watch.

Soon after Officer Campbell was alerted to the pill overdose, he confiscated Mr. Taylor's drinking cup. Sgt. Williams, meanwhile, phoned medical staff to report the incident and was instructed to escort Mr. Taylor (with Officer Campbell's assistance) to the so-called "shakedown booth," which comprised a bare cell furnished only by a mattress and a

toilet, where medical and mental health care staff members could observe Mr. Taylor through a real-time video monitoring system. Williams Aff. ¶ 8, dkt. 81-3.[2] During the ensuing two-hour period, Mr. Taylor was physically unattended but was able to notify Sgt. Williams that he was beginning to experience chest and abdominal pains, which information Sgt. Williams reported on to medical staff, though no further instructions were forthcoming. *Id.* ¶ 11.

Sgt. Williams and Officer Campbell (eventually) escorted Mr. Taylor to the infirmary, where he was again placed in a shakedown booth for approximately two hours before medical staff attended to him. Mr. Taylor claims that he "was forced to suffer and was in severe pain" during this two-hour interval. Taylor Decl. ¶ 12, dkt. 86. At approximately 10 p.m., Mr. Taylor was treated for his complaints of sharp pain and tightness in his chest and stomach. Dkt. 72-1 at 58–60. As reported in Mr. Taylor's medical records, "his vitals [we]re within normal range," with the exception of his high blood pressure. *Id.* at 60. Mr. Taylor

---

[2] On May 19, 2022, Mr. Taylor submitted an "Offender Grievance" recounting the events of May 11, 2022, and complaining that Sgt. Williams had denied him access to medical treatment. Dkt. 45-1 at 3. In his June 14, 2022, response, Sgt. Williams stated that he had no recollection of the incident. *Id.* at 4. Mr. Taylor argues that Sgt. Williams's Affidavit, which the Pendleton Defendants have submitted in support of their summary judgment motion, should thus be disregarded and stricken from the record as a "sham affidavit" because in it Sgt. Williams recounts his recollection of the May 11, 2022, incident. Dkt. 87 at 2. "[T]he sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony." *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020). Here, Sgt. Williams's initial grievance response was not sworn under the penalty of perjury (nor was it, for that matter, submitted to the summary judgment record before us): The sham-affidavit rule therefore does not apply here or otherwise affect our consideration of Sgt. Williams's Affidavit.

was given "sublingual nitroglycerin" and Tylenol, and was encouraged "to eat his food and drink a lot of fluids." *Id.*[3]

Over the course of the following week, from May 12, 2022, through May 19, 2022, Mr. Taylor was visited by mental health providers on a daily basis. Despite Mr. Taylor's repeated complaints to Dr. Lamar and Ms. Moss about the "unhealthy and inhumane conditions" of his housing arrangement, he was returned to G-House. Taylor Decl. ¶ 12, dkt. 78-1. When Mr. Taylor denied having had suicidal ideations and/or intent to harm himself, he was released from suicide watch and scheduled for the routine one, two, and four-week post-suicide follow-ups.

### F.    June 2022

On June 1, 2022, during a post-suicide watch follow-up visit from Ms. Moss, Mr. Taylor reported his continued struggles with depression, but, according to Ms. Moss's notes, expressed disinterest in any suggested coping skills. Dkt. 72-1 at 87. Mr. Taylor also stated that he had not been attending recreation due to feeling uncomfortable and that he had been experiencing intermittent suicidal thoughts, though he had neither a plan nor the means to act on those thoughts.

On June 9, 2022, Mr. Taylor was seen by Ms. Manning for medication management. He reported that the Remeron prescription caused him to have "crazy thoughts" and worsening suicidal ideations; he also admitted to "self-medicating" with "whatever [substances] I can get, whenever," which included spice and meth. Mr. Taylor described feeling anxious,

---

[3] Mr. Taylor's medical records also indicate that Mr. Taylor would "be seen after 1 hour and reassessed," though it is unclear if or when this follow-up occurred. *Id.*

agitated, overwhelmed; experiencing difficulty breathing and racing thoughts; and pacing in his cell. He also shared that he had cut himself one month prior but denied having had any further plans or intent to harm himself. (There are no records of Mr. Taylor submitting any health care request forms concerning his reported cutting). Ms. Manning discontinued the Remeron and prescribed Zoloft, and discussed with Mr. Taylor the negative impact that illicit substances can have on mental health. She also expressed concern that Mr. Taylor's symptoms could be side effects of such substance use.

On June 15, 2022, Mr. LaReau again visited Mr. Taylor for a post-suicide watch follow-up. Mr. Taylor reported that he was "doing alright" and that he was not currently suicidal. Dkt. 72-1 at 96. Mr. Taylor complained about the heat in the RSH unit and expressed interest in taking anger management courses. Mr. LaReau submitted that request on Mr. Taylor's behalf and noted that Mr. Taylor's weekly and monthly visits from mental health providers would proceed accordingly. *Id.*

### G.    July 2022

On July 7, 2022, during a welfare check from Ms. Moss, Mr. Taylor reported difficulty sleeping, feeling down, and having "crazy thoughts" as well as suicidal ideations (though he, once again, denied having any specific plans or means to self-harm). *Id.* at 99. Mr. Taylor discussed his struggles with life in restrictive-status housing and accepting that he was incarcerated; however, he was unreceptive to the coping skills offered by Ms. Moss.

Soon thereafter, on July 7 or 8, 2022, Mr. Taylor (apparently dissatisfied by his visit from Ms. Moss) submitted a health care request form expressing that he felt as though his "issues [we]re being ignored" and that he "would like to speak to somebody from mental

health who will help [him] and listen." Dkt. 77-1 at 23. In response to this request, Mr. Taylor was visited on July 18, 2022, by non-party Mental Health Provider Ayana Brown ("Ms. Brown"), to whom he reported struggling with his thoughts, including "occasional[ ]" suicidal ideations, which he "convincingly denied" having had at the time of the evaluation. Dkt. 72-1 at 102. Mr. Taylor had recently switched to Zoloft and was not yet experiencing any side effects.

On July 21, 2022, Mr. Taylor met with Ms. Manning for medication management. Ms. Manning noted that Mr. Taylor was "agreeable and participated in shared decision making" as he reported that he was tolerating the Zoloft without adverse effects, except for recently feeling "anxious and low, excessive[ly] worr[ied], and easily overwhelmed." *Id.* at 105–06. Ms. Manning increased Mr. Taylor's Zoloft dose "to aid with symptom reduction" and discouraged him from using illicit substances. *Id.* at 106.

### H.    August 2022

On August 20 (or 22), 2022, Mr. Taylor completed a health care request form, wherein he stated that he had "cut [him]self with a razor" and needed "to see medical staff." Dkt. 77-1 at 26 ("I felt overwhelmed[,] and I cut myself. I just feel like my mind is going crazy!"). The medical staff responded by "schedul[ing] [Mr. Taylor] to be seen for [a] follow-up." *Id.*

### I.    September 2022

In a health care request form submitted by Mr. Taylor and dated on September 7, 2022, he stated that he was "having suicidal thoughts" and that he "ke[pt] asking the officers

to help [him] and call somebody from mental health but nobody [wa]s coming." *Id.* at 27.

On September 8, 2022, during a medication management visit from Ms. Manning, Mr. Taylor stated that the Zoloft had not noticeably improved his mood and that he continued to struggle with negative emotions. He told Ms. Manning that one month prior he had cut himself, though he realized it only after he "woke up with blood on the sheet." Dkt. 72-1 at 111. To aid with Mr. Taylor's symptoms, Ms. Manning increased the dosage of his Zoloft and prescribed Prazosin to treat his PTSD, anxiety, and depressed mood. *Id.* at 112.

In response to his September 7, 2022, health care request form, Dr. Lamar ordered a safety evaluation to be conducted on Mr. Taylor, which Ms. Brown carried out on September 9, 2022. At the time of this assessment, Mr. Taylor denied any present suicidal ideations. Ms. Brown encouraged Mr. Taylor to try journaling and instructed him to submit another health care request form if that practice did not help. *Id.* at 116.

On September 19, 2022, Mr. Taylor was evaluated by Ms. Brown after he complained of having "crazy thoughts." *Id.* at 119. During this appointment, Mr. Taylor shared that he had been experiencing "racing thoughts," trouble sleeping, paranoia, and fears that "someone is recording him." *Id.* Mr. Taylor "expressed concerns about having to 'deal with this' the rest of his life," but he denied having suicidal thoughts. *Id.*

## J.    October 2022

On October 6, 2022, Mr. Taylor was again seen by Ms. Manning for medication management, during which visit he reported mood swings and feelings of hopelessness but denied suicidal ideations or thoughts of self-harm. *Id.* at 123. He also shared that he had not used illicit substances for approximately two months. In her "assessment" notes, Ms.

Manning stated, "[w]ill stop Prazosin," as it had been "ineffective and possibly worsening sleep issues." *Id.* at 124. She and Mr. Taylor "discussed treatment options," after which Ms. Manning started Mr. Taylor on "Lamictal to assist with mood stabilization" and continued Zoloft. *Id.*

### K.    November 2022

At his next medication management visit with Ms. Manning on November 9, 2022, Mr. Taylor stated that he had not taken any of his medications for the past two weeks "because the pills looked different ([in] color and shape, sometimes half tablets)," and he commented that jail staff " 'w[as] on some bullshit' trying to mess with him." *Id.* at 129. (He also mentioned suspicions that "his food [was] being tampered with." *Id.*) Because Mr. Taylor was still complaining of "racing thoughts" and frequent pacing, Ms. Manning discontinued his Lamictal and Zoloft prescriptions and started him on Zyprexa for paranoia, mood, and anxiety. *Id.* at 130.

On November 23, 2022, Mr. Taylor had an appointment with Dr. Lamar during which he discussed his anxiety and depression but denied having had suicidal ideations. He also disclosed that he had not been taking his medications, which Dr. Lamar relayed to Mr. Taylor's prescribing physician to address at his next medication management session.

## IV.    Procedural History

Mr. Taylor, proceeding *pro se*, filed his complaint on November 8, 2022. We screened his complaint pursuant to 28 U.S.C. § 1915A and permitted his Eighth Amendment claims to proceed. Dkt. 16. On July 18, 2023, we denied Mr. Taylor's motion for a preliminary injunction challenging the conditions of his restrictive housing unit on the

grounds that he had since been returned to general population and thus could not demonstrate a risk of irreparable harm. Dkt. 48.

On April 9, 2024, the Centurion Defendants moved for summary judgment on all claims against them. Dkt. 72. On May 6, 2024, the Pendleton Defendants likewise moved for summary judgment. Dkt. 80. Both motions are fully briefed and ripe for ruling.

## DISCUSSION

Mr. Taylor alleges that all Defendants were deliberately indifferent to his serious medical need for different and/or additional mental health treatment, in violation of the Eighth Amendment's proscription against cruel and unusual punishment. The Eighth Amendment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 888–89 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.' " *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

For purposes of the present summary judgment motions, we accept (and no Defendant refutes) that Mr. Taylor's mental health diagnoses were objectively serious. To avoid summary judgment, then, the evidence in the record must allow a reasonable jury to conclude that Defendants acted with deliberate indifference—that is, that they "consciously

16

disregarded a serious risk to [Mr. Taylor]'s health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up).

Deliberate indifference requires more than negligence or even objective recklessness. *Id*. Rather, Mr. Taylor "must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (emphasis in original). "Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean*, 18 F.4th at 241 (internal citations omitted).

"To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right." *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). For this purpose, we analyze Mr. Taylor's claims against the individual Centurion Defendants, Centurion itself, Sgt. Williams and Officer Campbell, and Warden Reagle as follows.

## I. Individual Centurion Defendants

Generally, medical professionals "are 'entitled to deference in treatment decisions . . . .'" *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) (quoting *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)). "A prisoner may establish deliberate indifference by demonstrating that the treatment he received was 'blatantly inappropriate.' " *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (quoting *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)). "Making that showing is not easy: A medical professional is entitled to deference in

17

treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Id.* (internal quotations and citations omitted). Furthermore, mere "[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

Here, Mr. Taylor argues that Dr. Lamar and Ms. Moss repeatedly disregarded his deteriorating mental health conditions and proceeded to administer "blatantly inappropriate and inadequate treatment." Dkt. 79 at 10. He argues that his decompensation was exacerbated by his placement in a RSH unit, and Centurion Defendants, as medical professionals, opted for the "easiest and [least] effective treatment," in violation of his Eighth Amendment rights. *Id.*

The undisputed record evidence before us does not support Mr. Taylor's claim that the individual Centurion Defendants were deliberately indifferent to his serious medical needs. To the contrary, the record evidence demonstrates that, between January 3, 2022, and November 8, 2022, Mr. Taylor received regular, consistent, and routine access to individualized treatment sessions through daily opportunities to meet with mental health care providers as well as through his weekly in-cell and monthly out-of-cell therapy sessions by various staff members. Additionally, Mr. Taylor had unhindered access to (and indeed frequently submitted) health care request forms that were timely addressed by medical staff.

Nothing in the record suggests that the individual Centurion Defendants failed to exercise their medical judgment in responding to Mr. Taylor's complaints, nor that their treatment choices were outside prevailing standards. *See Walker v. Wexford Health*

18

*Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019) (medical professionals entitled to choose from "a range of acceptable courses based on prevailing standards in the field"). Indeed, in addition to regular therapy sessions, Mr. Taylor was visited on a regular basis for medication management sessions, which often resulted in necessary adjustments to his treatment plan based on his feedback. Beyond his bare assertion that he "was not treated with adequate mental health treatment," dkt. 79 at 10, Mr. Taylor adduces no specific evidence suggesting that his treatment "was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (internal quotation and citation omitted).

Mr. Taylor's argument that he "did not begin to receive treatment and care until after he attempted to commit suicide," dkt. 79 at 7, is belied by the record evidence documenting frequent visits from mental health care providers who engaged him in therapy sessions, managed his medication, and responded to his mental health care needs. As such, Mr. Taylor has failed to show that the individual Centurion Defendants intentionally or willfully disregarded his mental health needs. While Mr. Taylor certainly did, on occasion, refuse medical visits and admit noncompliance with his existing treatment plans,[4] no "inmate is . . . entitled to demand specific care, and medical professionals may choose from a range of acceptable courses based on prevailing standards in the field." *Walker*, 940 F.3d at 965.

---

[4] By way of example, on March 9, 2022, Mr. Taylor declined a therapy session, stating, "no, I'm good"; on March 10, 2022, he refused an annual chronic health examination; and, in early November 2022, he admitted to medication noncompliance.

That Mr. Taylor might have disagreed with those treatment choices simply does not—without more—suffice to establish an Eighth Amendment violation. *Pyles*, 771 F.3d at 409.

The Centurion Defendants response to Mr. Taylor's May 11, 2022, suicide attempt further demonstrates that they were in no way deliberately indifferent to his serious medical needs. Immediately following Mr. Taylor's ingestion of an assortment of pills, Mr. LaReau notified Sgt. Williams and medical staff in order to ensure that Mr. Taylor would be properly monitored. After Mr. Taylor was evaluated at the infirmary, he was placed on suicide watch and visited by staff thereafter on a daily basis: The Centurion Defendants assessed Mr. Taylor every day between May 12, 2022, and May 19, 2022, and, thereafter, routinely engaged Mr. Taylor in post-suicide watch follow-up appointments.

Mr. Taylor points us to a settlement agreement that resolved *Indiana Protection and Advocacy Services Commission v. Commissioner of the Indiana Department of Corrections*, No. 1:08-cv-01317-TWP-MJD (S.D. Ind.), a matter involving IDOC's treatment of inmates' mental health (hereinafter referred to as the "IPAS Settlement Agreement"). Dkt. 77-1 at 40. In 2008, the Indiana Protection and Advocacy Services Commission ("IPAS") filed suit against IDOC alleging that the continued confinement of mentally ill prisoners in restrictive-status housing, formerly referred to as "segregation," without appropriate access to mental health care and treatment violated the Eighth Amendment. After a bench trial resulting in a finding that IDOC had, as a matter of law, contravened inmates' constitutional rights, the parties privately entered into the IPAS Settlement Agreement, according to which seriously mentally ill inmates are no longer to be placed in restrictive-status housing for more than thirty days unless (1) they are deemed too dangerous to return to general

population; or (2) they desire to stay. Dkt. 77-1 at 50–51. Should a seriously mentally ill inmate remain in restrictive-status housing, IDOC must ensure certain minimum access to and input from mental health professionals. *See id.* The IPAS Settlement Agreement applies to all IDOC facilities, including the Pendleton Facility; thus, its terms apply to Mr. Taylor's custody at issue here. *Mast v. Donahue*, No. 2:05-cv-00037-JPH-DLP, 2019 WL 3306204, at *3, *5 (S.D. Ind. July 23, 2019) (stating that the IPAS Settlement Agreement "could be invoked as precedent, if necessary, should similar circumstances reemerge within the" IDOC).

Mr. Taylor argues that Dr. Lamar has admitted "that she is aware" of the IPAS Settlement Agreement and the treatment protocol outlined therein. Nevertheless, Mr. Taylor asserts, Dr. Lamar "blatantly disregarded this knowledge and administered inappropriate and inadequate mental health treatment" while Mr. Taylor was housed in G-House. Dkt. 79 at 3. Contrary to Mr. Taylor's arguments, the record evidence does not support the conclusion that Dr. Lamar (or any other individual Centurion Defendant) administered legally or constitutionally deficient mental health treatment. Rather, Dr. Lamar ensured that Mr. Taylor had extensive access to individualized therapy and treatment sessions and that Mr. Taylor's health care requests were timely addressed. Dr. Lamar's awareness or knowledge of the IPAS Settlement Agreement does not, in and of itself, establish that the treatment plan she authorized for Mr. Taylor was inadequate or improper.

## II.  Centurion

Centurion is a limited liability company that contracts with IDOC to provide mental health services to inmates at Pendleton. "Such contractors are treated the same as

municipalities for liability purposes in a § 1983 action." *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010). "A municipality may be liable for harm to persons incarcerated under its authority if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners." *Id.* (internal quotation and citation omitted). "The municipal policy or practice must be the 'direct cause' or 'moving force' behind the constitutional violation, which a plaintiff may show directly by demonstrating that the policy is itself unconstitutional." *Id.* "If a plaintiff cannot identify any formal policy that is unconstitutional, the plaintiff may show deliberate indifference through 'a series of bad acts' creating an inference that municipal officials were aware of and condoned the misconduct of their employees." *Id.* In other words, a "widespread practice" might be "so permanent and well-settled that it constitutes a custom or practice." *Teesdale v. City of Chicago*, 690 F.3d 829, 834 (7th Cir. 2012).

Here, Mr. Taylor alleges that Centurion has a widespread practice of denying seriously mentally ill inmates necessary treatment, evaluations, and assessments; ignoring obvious signs of mental health deterioration and decompensation; administering inappropriate treatment; failing to properly train employees how to identify and address inmates' deterioration and decompensation; and intentionally delaying mental health treatment.

Mr. Taylor's claim against Centurion fails on the merits because he has not identified any unconstitutional policy, custom, or practice adopted or condoned by Centurion, nor does our review of the treatments afforded to Mr. Taylor from January 3, 2022, through November 23, 2022, allow the inference that Centurion acted with deliberate indifference towards his serious medical needs. Rather, the record demonstrates that, through

Centurion's policies, Mr. Taylor was provided daily opportunities to engage with mental health professionals; was given access to individualized therapy sessions—both weekly, in-cell sessions as well as monthly, out-of-cell sessions—and regular medication management visits, and was ensured an ability to submit an unlimited number of health care request forms. Mr. Taylor fails to explain how these policies and practices support his argument that Centurion was deliberately indifferent to his serious medical needs. *Giles v. Godinez*, 914 F.3d 1040, 1050 (7th Cir. 2019).

Insofar as Dr. Lamar, Ms. Moss, and/or Mr. LaReau, as Centurion employees, arguably rendered inadequate care to Mr. Taylor, the record contains no evidence that Centurion's officials "knew of and condoned" such inadequate practices. *See Minix*, 597 F.3d at 832. Relatedly, to the extent that Mr. Taylor maintains that the individual Centurion Defendants "deprived [him] of adequate medical care," he has not explained how a " 'single instance of allegedly unconstitutional conduct . . . demonstrate[s] [Centurion's] deliberate indifference' to inmates' medical needs." *Id.* (quoting *Est. of Novack ex rel. Turbin v. Cnty. of Wood*, 226 F.3d 525, 531 (7th Cir. 2000)). In short, Mr. Taylor has not articulated (and the record evidence does not otherwise reveal) any basis on which a reasonable jury could conclude that Centurion's policies or widespread practices resulted in deliberate indifference to his serious medical needs.

## III.    Sergeant Williams & Officer Campbell

Non-medical professionals, such as correctional officers, can be deliberately indifferent to a prisoner's serious medical needs by "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429

U.S. at 105. Generally, however, prison officials are entitled to rely on the expertise of medical personnel. *Arnett*, 658 F.3d at 755. "The only exception to this rule is that non-medical officers may be found deliberately indifferent if they have reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *McGee*, 721 F.3d at 483 (internal quotation and citations omitted).

Mr. Taylor's Eighth Amendment claim against Sgt. Williams and Officer Campbell relates solely to Mr. Taylor's May 11, 2022, suicide attempt. Mr. Taylor argues that Sgt. Williams and Officer Campbell abandoned him in the shakedown booth for over two hours, ignored his pleas for medical assistance, and failed to contact medical providers, despite their awareness of the seriousness of the situation and the need for immediate medical attention. *See* Taylor Dep. 10:21–11:2, dkt. 81-1. In Mr. Taylor's words, he "was stuck in the shakedown booth for over two hours begging and asking [Sgt.] Williams and Officer Campbell for assistance and telling them that [he] was having chest pains and vision problems." *Id.* at 12:18–22.

Taking the facts in the light most favorable to Mr. Taylor, Sgt. Williams's and Officer Campbell's conduct on May 11, 2022, still does not reflect deliberate indifference to Mr. Taylor's serious medical needs. While it is, indeed, undisputed that Mr. Taylor voiced numerous complaints about chest and abdominal pain while awaiting further medical attention in the shakedown booth, it is also unrefuted that Sgt. Williams, the supervising officer, had followed the established protocol by reporting Mr. Taylor's complaints to members of the medical staff and in deferring to their decision as to whether Mr. Taylor needed to be escorted to the infirmary immediately or remain in the shakedown booth.

Williams Aff. ¶ 11, dkt. 81-3. To that end, neither officer denied or delayed Mr. Taylor's access to medical care, or otherwise interfered with his treatment. To the contrary, Sgt. Williams and Officer Campbell correctly deferred to the decisions of medical professionals, as they are both entitled—and expected—to do. *McGee v. Parsano*, 55 F.4th 563, 569 (7th Cir. 2022). That Mr. Taylor disagrees with the course of treatment or insists that he should have been evaluated by medical staff sooner does not, as a matter of law, establish a violation of his Eighth Amendment rights.

Mr. Taylor has not refuted that Officer Campbell immediately confiscated the drinking cup after learning of Mr. Taylor's act of self-harm; that Sgt. Williams and Officer Campbell safely secured Mr. Taylor in the shakedown booth under the direct care and supervision of medical staff; and that Sgt. Williams and Officer Campbell timely complied with instructions from medical staff to escort Mr. Taylor to the infirmary. He maintains, however, that Sgt. Williams and Officer Campbell took no action whatsoever to solicit medical assistance after learning that Mr. Taylor had swallowed an assortment of pills in an act of self-harm. Despite the fact that Mr. Taylor himself was not "sure if anyone [had] contacted medical or not," Taylor Dep. 29:22–30:11, dkt. 81-1, he argues that the G-House logbook from May 11, 2022, dkt. 85-2, which "documents all events and actions that take place," establishes that Sgt. Williams "never contacted medical." Dkt. 87 at 4. As Sgt. Williams and Officer Campbell emphasize, however, there is no evidence that correctional staff was in fact required to log any and "all events and actions that take place" throughout the day. Dkt. 88 at 5. Thus, the absence of logbook entries regarding Sgt. Williams's (reported) contacts with medical does not specifically contradict Sgt. Williams's sworn

statement that he relayed Mr. Taylor's complaints to medical. Williams Aff. ¶ 11, dkt. 81-3; *see also White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (non movant receives the "benefit of reasonable inferences from the evidence, but not speculative inferences in his favor" (cleaned up)). As such, no reasonable jury could find that Sgt. Williams and/or Officer Campbell ignored Mr. Taylor's medical complaints or denied him access to medical attention.

## IV.   Warden Reagle

"[A] supervising prison official cannot incur § 1983 liability unless that officer is shown to be personally responsible for a deprivation of a constitutional right." *Vance v. Peters*, 97 F.3d 987, 992–93 (7th Cir. 1996) (citation omitted). The personal responsibility requirement of § 1983 is satisfied when "the conduct causing the constitutional deprivation occurs at" the prison official's "direction or with [his] knowledge and consent." *Gentry*, 65 F.3d at 561 (alteration in original) (internal quotation and citation omitted).

There is no dispute here that Warden Reagle was unaware and also had no basis on which to infer that Mr. Taylor had (allegedly) been denied adequate mental health treatment up to and including May 11, 2022. Reagle Aff. ¶ 4, dkt. 81-2; Taylor Dep. 44:24–45:3, dkt. 81-1. Although Warden Reagle was informed about Mr. Taylor's attempted suicide "the following day or sometime that week via staff reports," Reagle Aff. ¶ 5, dkt. 81-2, Mr. Taylor does not argue that Warden Reagle was thereafter deliberately indifferent to his serious medical needs. Because there is no evidence suggesting that Warden Reagle was personally involved in Mr. Taylor's medical treatment, Mr. Taylor's Eighth Amendment claim against Warden Reagle in his individual capacity necessarily fails. *Minix*, 597

26

F.3d at 833 ("[I]ndividual liability under § 1983 requires personal involvement in the alleged constitutional deprivation.").

## V.    Permanent Injunctive Relief

In his Complaint, Mr. Taylor seeks injunctive relief against Warden Reagle (in his official capacity) and Centurion for their (alleged) ongoing failure to provide him with adequate mental health care, including transfer to a mental health treatment facility. Dkt. 1 at 22. To merit the entry of a permanent injunction, a plaintiff must prove (1) that he has suffered an irreparable injury (i.e., actual success on the merits); (2) that remedies available at law are inadequate to compensate for that injury; (3) that an equitable remedy is warranted in consideration of the balance of hardships between the plaintiff and the defendant; and (4) that the public interest would not be disserved by a permanent injunction. *LAJIM, LLC v. General Electric Co.*, 917 F.3d 933, 944 (7th Cir. 2019) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

For the reasons stated above, Mr. Taylor's claims cannot prevail on the merits, and, as such, his request for permanent injunctive relief must also be denied. Warden Reagle and Centurion are each entitled to summary judgment accordingly.

## CONCLUSION

For the reasons discussed above, we **GRANT** the Motions for Summary Judgment filed by Defendants Centurion Health of Indiana, LLC, Akilah Lamar, Aryana Moss, and Jeremy LaReau [Dkt. 72] and Defendants Dennis Reagle, Sergeant Jacob Williams, and Officer Chris Campbell [Dkt. 80].

Mr. Taylor's motion for status update [Dkt. 98] is **GRANTED** to the extent that this Entry resolves the pending summary judgment motions. The Clerk is **DIRECTED** to enclose a public docket sheet with Mr. Taylor's copy of this Entry.

Final judgment shall enter accordingly.

IT IS SO ORDERED.

Date:    3/18/2025

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

QUENTIN L. TAYLOR
178973
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Carlton Wayne Anker
Lewis and Wilkins LLP
anker@lewisandwilkins.com

Jeb Adam Crandall
BLEEKE DILLON CRANDALL ATTORNEYS
jeb@bleekedilloncrandall.com

Jordan Douglas Hall
Lewis and Wilkins LLP
hall@lewisandwilkins.com

Eric Ryan Shouse
Lewis And Wilkins LLP
shouse@lewisandwilkins.com

William Dean Young
Lewis And Wilkins LLP
young@lewisandwilkins.com